NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230625-U

NO. 4-23-0625

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 5, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| HAROLD T. MABRY, | ) | No. 22CF974 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Randy Wilt, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Lannerd and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding (1) the evidence was sufficient to show defendant was at least 17 years old when he engaged in the conduct charged as predatory criminal sexual assault of a child and (2) defense counsel was not ineffective for asking a question which elicited testimony tending to establish the age-of-the-offender element of the offense of predatory criminal sexual assault of a child.

¶ 2    Defendant, Harold T. Mabry, appeals from his conviction of one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)). He argues the evidence was insufficient to prove beyond a reasonable doubt he was 17 years old or older when he committed the act charged, an element of the offense of which he was convicted. Alternatively, he contends defense counsel was ineffective for eliciting evidence critical to supporting the finding he was 17 years old or older when he committed the act charged. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4        A grand jury indicted defendant on two counts of predatory sexual assault against L.M. (*id.*). The first count charged, sometime between April 24, 2017, and April 24, 2019, defendant touched the sex organ of L.M. with his hand. L.M. was then under the age of 13. The second count charged, during the same time period, defendant placed his sex organ in L.M.'s sex organ.

¶ 5        Defendant had a bench trial in March and April 2023. The trial court found defendant guilty of the second count based on evidence tending to show the charged act occurred in 2018.

¶ 6        A. Testimony of Kim Larson and the Recording of Her Interview of L.M.

¶ 7        Kim Larson of the Carrie Lynn Children's Center (Carrie Lynn) testified she was trained to conduct forensic interviews of children; she learned to conduct "structured conversation[s] *** in a non-suggestive, non-leading manner in order to obtain detailed information regarding allegations." She conducted a forensic interview of L.M., who was then 12 years old, on March 1, 2023. The trial court admitted the video recording of the interview.

¶ 8        In the recording, L.M. stated she was seven or eight when the assaults took place and defendant was a "teenager." She said they ended when she was nine years old and defendant went back to live in his mother's home, which she said, with a degree of hesitation, was in "Arkansas." She said defendant had done something inappropriate to her four or five times. She further said he had "raped" her. When Larson asked her what specifically she meant when she talked about rape, L.M. described an instance during which defendant placed his penis in her vagina. (She referred to both organs as "private parts," but Larson elicited statements from L.M. clarifying the body parts to which she was referring.) After L.M. described the assault she

described as rape, Larson asked L.M. to describe the other assault. L.M. then stated defendant had put his hand in her private part.

¶ 9    Larson did not ask questions to establish when defendant was present in the same household as L.M. L.M. was notably quiet or reticent during the interview. There were often long delays between Larson asking a question and L.M. answering. Indeed, L.M. did not answer some questions at all. Consequently, L.M. answered few questions given the time the interview took.

¶ 10    B. Testimony of A.M.

¶ 11    A.M., L.M.'s mother, testified L.M was born on April 24, 2009. L.M. lived with her and other family members in Rockford, Illinois. A.M. testified, in 2022, she received a call from L.M.'s teacher, who said A.M. needed to talk to L.M. When A.M. initially asked L.M. whether she had anything she needed to tell her about, L.M. said she did not. However, when A.M. said L.M.'s teacher had contacted her, L.M. agreed she had something she needed to disclose. L.M. told her mother, when she was seven or eight years old, defendant—A.M.'s stepson and L.M.'s stepbrother—had touched her. There had been two incidents, one involving touching her "private area" and one involving penetration. A.M. did not ask L.M. any questions but instead let L.M. describe the assaults "in her own words."

¶ 12    A.M. testified defendant had lived with her and her family "off and on" when he was not living with his mother in Arkansas. His last stay occurred when defendant was 18 to 19 years old and had just graduated from high school in Arkansas. A.M. thought it lasted about a year. She and her family, including L.M., had been to Arkansas to go to defendant's graduation, and defendant came back with them. He had previously lived with A.M. and her family for a period that ended before he started his junior year in high school. She could not remember the specific years in which either of these stays occurred.

¶ 13                               C. Testimony of L.M.

¶ 14          L.M. testified after her mother. She said she was 13 years old. On direct examination, she agreed she remembered talking to someone at Carrie Lynn (*i.e.*, Larson) about defendant. She agreed she had described two incidents, one involving defendant placing his penis in her vagina and one involving him placing his hand in her vaginal area. She testified she told the truth to Larson. She further agreed she had told Larson the abuse stopped when she was nine years old, which was when defendant moved out of the house. She did not know the year either incident occurred.

¶ 15          On cross-examination, L.M. agreed she told Larson the abuse happened when she was seven or eight years old, but it stopped when she was "around 9." She agreed she had said the abuse stopped when defendant "moved to Arkansas to live with his mom."

¶ 16          L.M. agreed she knew she had gone to defendant's high school graduation in Arkansas. After this agreement, the following exchange ensued:

"Q. After [defendant] graduated high school in Arkansas, do you know— did he ever move back up to Rockford?

A. Yeah.

Q. Did anything ever happen with [defendant] after he moved back to Rockford—between you and [defendant]?

A. Yeah.

* * *

Q. What happened?

A. He raped me.

Q. After he moved back from Arkansas?

A. Yep.

Q. Did you tell that to the people at the Carrie Lynn Center?

A. No.

* * *

Q. Did you tell that to your mom?

A. Told what to my mom?

THE COURT: I think the question was—

[defense counsel] asked whether or not she told her mother that this gentleman raped her after he came back from Arkansas after high school.

Is that what you're asking?

[DEFENSE COUNSEL]: That's correct.

THE COURT: So I think what he's saying is—maybe we misunderstood you.

Are you saying that, when [defendant] moved back to Rockford, after he graduated high school, he raped you again? Is that what you're saying?

[L.M.]: No. I don't understand the question.

THE COURT: Okay. [Defense counsel,] back up and go over it again, if you need to; but let's break it down a little bit more for us, please. All right?

[DEFENSE COUNSEL]: Sure. I sure will.

BY [DEFENSE COUNSEL]:

Q. I'll ask this a different way.

You told your mom that these things happened when you were 7 or 8; is that right?

A. When I was 7 or 8?

Q. Yeah. Is that what you told your mom?

A. I told—I didn't tell my mom. I told the Carrie Lynn people, and they told my mom.

Q. You told the people at Carrie Lynn that this happened when you were 7 or 8?

* * *

A. Yes."

¶ 17 On redirect examination, the State elicited L.M.'s testimony that she was uncertain how many times defendant had moved to and from Arkansas. She agreed she did not remember because she was young when some of the events occurred. She was uncertain of the dates but was sure the abuse had happened.

¶ 18 After redirect examination, the trial court questioned L.M.:

"Q. You told the people at Carrie Lynn that [the abuse] stopped when you were about 9 because [defendant] moved to Arkansas; is that right?

A. Yeah.

Q. Now, I think you testified that you went to his high school graduation down in Arkansas; is that right?

A. Yeah.

Q. And then he came back to Rockford after his high school graduation?

A. Yes.

Q. Did it happen again after he came back to Rockford? After he graduated high school, did it happen again?

A. It happened, but...

* * *

Q. ***

Did you tell the lady at the Carrie Lynn Center that, after [defendant] came

back from Arkansas, which means after he graduated high school, that something

happened again?

A. I didn't say 'again', but I told her it happened.

Q. ***

I think there was a question about whether or not you told your mother

that, after [defendant] came to Rockford, after high school—did you tell her it

happened again, your mom? Did you tell her that?

A. I didn't say 'again'. I told her it happened."

¶ 19          On redirect examination, L.M. agreed she might have been a little older or younger
than seven or eight when the abuse occurred.

¶ 20                              D. Testimony of Rebecca Anderson

¶ 21          Detective Rebecca Anderson of the Rockford Police Department, the State's final
witness, testified she observed a March 24, 2022, interview of defendant conducted by "Detective
Martin." During the interview, defendant stated he was born on June 19, 1999, and graduated from
high school in 2018. He had lived in the same household as L.M. twice. First, he lived there when
he was 13 to 16 years old, before he returned to live with his mother in Arkansas. Second, he lived
there for five to six months after he graduated from high school, before he joined his mother "near
Machesney," that is, in Illinois.

¶ 22                              E. Defendant's Evidence: Testimony of Teresa Leak

¶ 23         Defendant called his mother, Teresa Leak, as his sole witness. Leak testified, in June 2016 and before his seventeenth birthday, defendant came to live with her in Arkansas. He started his junior year of high school in Arkansas and graduated from high school in Arkansas in May 2018. Before he moved to Arkansas, he had been living in Rockford with his father, in other words, in L.M.'s household. At the end of May 2018, he moved back to the Rockford household. In November 2018, he started living with Leak again, this time in Rockford. She was confident defendant had not returned to Rockford while he was going to high school in Arkansas.

¶ 24                    F. The Trial Court's Posttrial Rulings

¶ 25         The trial court denied defendant's motion for a directed finding at the close of evidence. Defendant argued, because L.M. testified the abuse stopped when defendant moved *to Arkansas*, something that occurred before he was 17, the State could not prove he was 17 or older at the times L.M. testified he assaulted her.

¶ 26         The trial court found the State had failed to prove defendant was 17 or older when he touched L.M.'s vagina with his hand (the count I assault). It deemed the State had failed to prove L.M. was not 7 years old or younger when this assault occurred; it thus could not exclude the possibility defendant was no older than 16 years old at the time. The court noted the "evidence [was] unrebutted that [defendant] moved to Arkansas before his 17th birthday and did not come back until after his high school graduation in May of 2018."

¶ 27         The trial court found defendant guilty of the second count predatory criminal sexual assault of a child, which alleged defendant penetrated L.M.'s vagina with his penis (the count II assault). The court deemed L.M.'s testimony "to have been very credible." It said this conclusion was influenced by L.M.'s willingness to admit uncertainty. It believed L.M.'s testimony of both assaults, but it said her testimony failed to establish the count I assault *did not* occur during

defendant's first stay in the household, *i.e.*, when the evidence suggested defendant was 16 years old or younger. It noted L.M. had testified the pattern of assaults ended when L.M. was nine years old, which was when defendant moved back in with his mother, albeit not in Arkansas as L.M. thought.

¶ 28     The trial court concluded L.M. was right about everything except the state to which defendant moved the second time he left L.M.'s household to live with his mother. It believed L.M. when she testified the count II assault occurred when defendant *returned* from Arkansas. It said L.M.'s statement defendant had moved to *Arkansas* at the end of this time had little significance, as L.M. was not someone who needed to keep track of defendant's address.

¶ 29     Defendant moved for reconsideration of the finding of guilt or, alternatively, for a new trial. He argued L.M.'s testimony was often unclear, but it was clear both assaults occurred before defendant moved to Arkansas. He contended the trial court could not find he was guilty beyond a reasonable doubt in the face of that testimony.

¶ 30     The trial court denied the motion, again stating L.M.'s testimony was clear and consistent but mistaken only on the matter of where defendant had moved when he left L.M.'s home in 2018.

¶ 31     The trial court sentenced defendant to six years' imprisonment.

¶ 32     This appeal followed.

¶ 33                    II. ANALYSIS

¶ 34     On appeal, defendant raises two claims. First, he argues the evidence was insufficient for the trial court to find he was 17 years old or older when the assault of which the court found him guilty occurred. Second, he argues, in the alternative, counsel was ineffective for

asking the question that caused L.M. to state defendant "raped" her "[a]fter he moved back from Arkansas."

¶ 35                                    A. Sufficiency of the Evidence

¶ 36          Defendant argues the evidence here was insufficient because the State failed to offer adequate proof of one element of predatory criminal sexual assault of a child: the offender was "17 years of age or older" (720 ILCS 5/11-1.40(a)(1) (West 2018)) when the charged act of sexual contact occurred. We disagree.

¶ 37          We address a question of the sufficiency of the evidence under the familiar standard of *Jackson v. Virginia*, 443 U.S. 307 (1979). *People v. McLaurin*, 2020 IL 124563, ¶ 22, 162 N.E.3d 252 (noting Illinois's adoption of the *Jackson* standard). Under that standard, "When a court reviews a challenge to the sufficiency of the evidence, the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson*, 443 U.S. at 319). "The testimony of a single witness is sufficient to convict if the testimony is positive and credible." *People v. Gray*, 2017 IL 120958, ¶ 36, 91 N.E.3d 876. "Minor discrepancies in testimony affect only its weight and will not render it unworthy of belief. [Citation.] In addition, where inconsistencies in testimony relate to collateral matters, they need not render the testimony of the witness as to material questions incredible or improbable." *Id.* ¶ 47. "It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Bradford*, 2016 IL 118674, ¶ 12, 50 N.E.3d 1112. When it addresses the sufficiency of the evidence, a reviewing court must not "retry the defendant, nor *** substitute [its] judgment for that of the trier of fact." *McLaurin*, 2020 IL

124563, ¶ 22. "A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *Gray*, 2017 IL 120958, ¶ 36.

¶ 38        Defendant here contends, although L.M. initially testified during cross-examination the assault occurred after he returned from Arkansas, "later in her testimony" she "equivocated" on the point. The "equivocation" was L.M. said both the assault occurred when defendant returned from Arkansas and before he went to live with his mother in Arkansas. He further notes, in her disclosure to A.M., L.M. described the assaults as occurring when she was seven or eight years old, whereas she was nine when he lived in her household after returning from Arkansas. He contends, because of his and her relative ages, and because it was uncontested he was in Arkansas before his seventeenth birthday, a rational trier of fact could not have rejected the possibility L.M.'s testimony referred to an assault occurring when he was under the age of 17 or, alternatively, occurring when he was in Arkansas.

¶ 39        We conclude the evidence was sufficient. To be sure, L.M.'s description of the count II assault as occurring both during the period he lived in her household after he graduated from high school and before he returned to his mother *in Arkansas* conflicted with the evidence he returned to his mother in Illinois after that stay. Further, L.M.'s statements suggesting the assaults occurred when she was seven or eight contained a trace of ambiguity when taken with her statements the assaults stopped when she was nine. However, her testimony the count II assault occurred after defendant returned from Arkansas (*i.e.*, after he was 17) was clear and concerned her direct experience. Moreover, L.M.'s seemingly incorrect testimony concerning defendant's address after he left her home for the second time did not detract from her credibility. After all, L.M. was only 13 years old at the time of the trial and was testifying regarding events that occurred,

at the most recent, not quite five years earlier. Further, as the trial court noted, she had no specific reason to remember defendant's new address.

¶ 40 Defendant argues L.M.'s statements the assaults ended when he returned to Arkansas point to the stay in L.M.'s household ending when he was 16 as the stay during which the assaults occurred. Certainly, these statements favored defendant. However, the trial court did not act irrationally in giving more weight to L.M.'s firsthand identification of the period in which the count II assault took place than to her apparently secondhand statement about where defendant went after he committed the count II assault. L.M., who testified she had been to defendant's high school graduation, also testified the count II assault occurred after that graduation. Her identification of that period as when the assault occurred was based on her own knowledge. However, nothing in the evidence suggests L.M. had personal knowledge of where defendant moved after his post-high-school stay in L.M.'s household. As the court noted, she had no reason to keep track of his forwarding address. A mistake about defendant's new address would be a different and lesser class of mistake than one concerning the events within L.M.'s personal knowledge. The court's role as the trier of fact was to determine the credibility of the witnesses. A key determination it made was L.M. was a credible witness—one who remembered her own life history—but nevertheless had imperfect recollections of less central points. Such a determination was one a rational trier of fact could make.

¶ 41 B. Ineffective Assistance of Counsel

¶ 42 Defendant next contends his counsel was ineffective for asking the question which caused L.M. to respond defendant "raped" her "[a]fter he moved back from Arkansas." The State argues the information at issue would have been revealed regardless, and therefore defendant suffered no prejudice from counsel's question. We disagree with defendant.

¶ 43        "Both the United States and Illinois constitutions guarantee criminal defendants the right to the effective assistance of counsel." *People v. Hale*, 2013 IL 113140, ¶ 15, 996 N.E.2d 607. To establish ineffective assistance of counsel, a defendant must show *both* (1) his counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance of counsel prejudiced defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); see *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting the *Strickland* standard). When an ineffective-assistance claim is raised for the first time on appeal, "our consideration of the issue is equivalent to a *de novo* review." *People v. Jefferson*, 2021 IL App (2d) 190179, ¶ 26, 190 N.E.3d 323.

¶ 44        The *Strickland* standard for deficient performance requires "[j]udicial scrutiny of counsel's performance [to] be highly deferential." *Strickland*, 466 U.S. at 689.

> "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

Therefore, to show defense counsel acted unreasonably, a defendant must overcome the presumption counsel's choice was an appropriate strategic choice:

> "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.*

¶ 45 Under the second prong of *Strickland*, an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. *Strickland* therefore requires a defendant to show a reasonable probability counsel's errors affected the outcome of the proceeding. See *id.* at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

¶ 46 We find no rule in Illinois law under which a question eliciting prejudicial evidence is *per se* unreasonable. If the circumstances of the case are consistent with a high-risk question being a strategic choice, and an answer to the question is prejudicial to the defendant, the defendant still bears the burden of showing that asking the question was not a sound strategic choice. Defendant has not overcome this burden.

¶ 47 In this case, we hold defendant has failed to satisfy *Strickland*'s first prong. Given the trial court's reliance on the time periods established by L.M.'s testimony under cross-examination and the court's clarifying questions, we have difficulty saying the initial questions did not prejudice defendant. However, this is a matter of hindsight.

¶ 48 At the close of the State's questioning of L.M., defense counsel faced a dilemma. He must have known Leak's testimony would tend to establish defendant had *returned* to Arkansas only once—just before his seventeenth birthday, which, given his June 19, 1999, birthdate, was on June 19, 2016. L.M. was born on April 24, 2009, so she turned seven on April 14, 2016. L.M. stated the abuse occurred when she was seven or eight. Thus, if one took all the testimony at face value *except* L.M.'s statement the abuse stopped when she was nine, one would conclude the abuse occurred after L.M.'s seventh birthday on April 24, 2016, and before defendant's seventeenth

birthday on June 19, 2016. But defense counsel also knew Leak's testimony would establish defendant returned to L.M.'s household after he graduated from high school—not long after L.M.'s April 24, 2018, ninth birthday—and went back to join Leak in November 2018, when L.M. was still nine. Given the delay in reporting and L.M.'s ages at the relevant times, a trier of fact might be inclined to conclude L.M.'s testimony the abuse stopped when she was nine was most likely accurate and thus reason the abuse occurred during defendant's second stay in L.M.'s household.

¶ 49    Defense counsel would thus have three possibilities to consider when weighing whether to ask L.M. if "anything ever happen[ed] with [defendant] after he moved back to Rockford." First, he would have to decide how likely it would be for the trial court to decide L.M.'s statement the abuse stopped when she was nine was the dispositive evidence as to defendant's age. Second, he would have to consider whether, under the deferential standard of *Jackson*, this court would sustain a conviction based on L.M.'s testimony regarding when the abuse stopped. Finally, he would have to decide whether L.M.'s sense of the timeline was based on her knowledge of when defendant returned to Arkansas or her certainty about her age when the abuse stopped.

¶ 50    The critical matter here is recognizing L.M.'s statement the abuse stopped when she was 9 gave the trial court *some basis* to conclude defendant was at least 17 when the charged actions occurred. In other words, when defense counsel began his cross-examination of L.M., the State had offered *some* evidence in support of the age-of-the-offender element of predatory sexual assault of a child. Counsel thus had to decide what the trial court would make of this evidence, what this court might potentially make of this evidence, and how those considerations weighed against the risks of questioning L.M. about what happened after defendant came back from Arkansas. This was not a simple choice. Further, where the sufficiency of the evidence is debatable, a reasonable defense attorney might consider information derived from privileged

communications with the defendant when deciding whether high-risk cross-examination is appropriate. Thus, any conclusion defense counsel's choice was unreasonable must rely on hindsight. Defendant has therefore not overcome the presumption counsel's conduct was the product of sound trial strategy.

¶ 51 Defendant argues, under cases such as the First District's *People v. Bailey*, 374 Ill. App. 3d 608, 872 N.E.2d 420 (2007), defense attorneys are "ineffective when they elicit testimony on cross[-]examination which proves a critical element of the State's case." However, we find *Bailey* and such related cases to be distinguishable. The *Bailey* court stated: "This court has held a defense attorney who elicits damaging testimony that *proves* an element of the State's case *may* be found to have provided ineffective assistance." (Emphases added.) *Id.* at 614. It concluded counsel was ineffective because it could not "find a valid trial strategy in defense counsel's pursuit of [the] line of questioning [at issue.]" *Id.*

¶ 52 A defense attorney is not ineffective merely because he or she elicits prejudicial evidence. The reasonableness prong of *Strickland* cannot vanish in such instances. To be sure, if at the time a defense attorney elicits the damaging testimony, the State has failed to offer any evidence to prove an element of an offense, it will generally be difficult to defend the reasonableness of asking a question creating a risk of changing the situation in the State's favor. Further, it is equally hard to defend the reasonableness of a question which clearly cannot benefit the defendant. Neither of these considerations apply here.

¶ 53                                    III. CONCLUSION

¶ 54 For the reasons stated, we affirm the trial court's judgment.

¶ 55 Affirmed.